[Civ. No. 2030. Second Appellate District.—February 25, 1918.]

JESUS MARIA RANCHO (a Corporation), Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

RAILROAD CORPORATION—KILLING OF CATTLE BY TRAINS—MAINTENANCE OF FENCES—LACK OF NEGLIGENCE.—In an action against a railroad company for damages for the loss of cattle killed by its trains, the evidence is insufficient to show negligence on the part of defendant in the matter of its duty, under section 485 of the Civil Code, to maintain fences along its right of way, where the cattle were all killed at a place where the country was composed of sand, which shifted and changed into banks and dunes at different points with the blowing of the winds, and the fences were frequently buried by dunes permitting the passage of cattle upon the tracks.

ID.—EXERCISE OF REASONABLE DILIGENCE.—A railroad company is bound to use reasonable diligence in keeping its right of way fences in repair, and it need not resort to extraordinary means, such as the maintenance of a special patrol, to insure that its fences will not be broken or that they are promptly repaired, if broken.

ID.—DEATH OF SUCKLING CALF—LIABILITY OF RAILROAD COMPANY.— In an action against a railroad company for the loss of a cow and her suckling calf, the defendant is liable for the death of the calf where the death of the cow resulted from the negligence of the company and the death of the calf from starvation following the loss of its mother.

Id.—Maintenance of Fences—Duty of Railroad Company.—It is incumbent upon a railroad corporation, by virtue of section 485 of the Civil Code, to maintain good and sufficient fences on both sides of its track and property, and there is no duty imposed upon adjoining land owners where the country is composed of sand, which shifts and changes into banks and dunes with the blowing of the winds, to erect windbreaks or other obstructions to prevent the sand from drifting and covering such fences.

Id.—Breaking of Gate and Fence—Killing of Cattle—Liability of Company.—A railroad company is not liable for the loss of cattle killed by one of its trains where the animals entered upon the defendant's right of way through a break in its fence caused by the throwing down of a gate and a part of the fence, in the absence of evidence that the gate or fence was defective or unfitted to meet ordinary conditions.

APPEAL from a judgment of the Superior Court of Santa Barbara County, and from an order denying a new trial. Robert M. Clarke, Judge.

The facts are stated in the opinion of the court.

Canfield & Starbuck, for Appellant.

Charles Kelley Hardenbrook, for Respondent.

WORKS, J., *pro tem.*—This is an action for damages for the loss of cattle killed by the appellant's railroad trains. The complaint sets up four causes of action. The first of these seeks to recover for the loss of two cows on January 25, 1912; the second for the loss of four cows on September 6, 1912; the third for the loss of a cow and calf on April 2, 1913, and the fourth for loss of a yearling heifer on April 28, 1913. Judgment was rendered in favor of respondent on all of the causes of action, and the appeal is from the judgment and from an order denying appellant's motion for a new trial.

While all four causes of action are based upon the alleged negligence of appellant in failing to maintain proper fences along its right of way, three of them—the first, third, and fourth—give rise to certain novel questions and, in a measure, may be considered together. The points presented under the second cause of action will be reserved for separate treatment in a later portion of the opinion.

The cattle were all killed near the Pacific Ocean, at a place where the country is composed of sand, which shifts and changes into banks and dunes at different points with the blowing of the winds. There is much evidence in the record as to the nature of these recurring mutations in the surface of the sand; suffice it to say that the changes are practically always in progress at the times when the winds blow with any great degree of force, and that they are amazingly sudden in the days and seasons when the winds blow heavily. The fences along the appellant's right of way are frequently buried by the dunes, but the points at which they are covered may change from time to time, as the winds are strong enough to bring about the change. Thus a part of the fence which is invisible on one day may be entirely freed from its covering a few days later by the prevalence of a strong wind. The three causes of action which are now under consideration arose through the claim of respondent that the cattle in question in them procured access to appellant's right of way over its fences at points where they were covered by the sand, it being asserted in the evidence that an entrance was effected in this manner from the adjoining property of the respondent, which owns the lands on either side of appellant's tracks through the country we have described.

The first contention of the appellant is that the evidence is insufficient to show negligence on its part in the matter of its duty, under section 485 of the Civil Code, to maintain fences along its right of way, no claim being made that the cattle were not actually killed by appellant's trains. There are two questions involved in this contention. The first is, Did the cattle enter the right of way in the manner claimed by the respondent? If they did, the second question is, Did the appellant have such notice, either actual or constructive, of the condition of the fence at the points of entry that it is chargeable with negligence for not having restored it to a proper condition? In determining these questions, each of the three causes of action must be considered separately.

The first cause of action arose out of an occurrence of about January 25, 1912, and involved the loss of two cows. The witness Graham testified to having found the carcasses of the cows on the right of way, and to having traced their tracks backward to a point at which they passed over the fence on the surface of the sand, from the west side of the

appellant's railroad track. This evidence clearly disposes of the question as to the manner in which the cattle entered the right of way, but the question of notice to the appellant of the condition of the fence at the point of entry is in a very different situation. Graham began to work for respondent on January 15, 1912, ten days before the cows were killed. He testified that "in January" the fence was covered with sand at a point about one thousand feet south of a certain crossing fence, which point he fixes as the place of entry of the cattle; but the slight effect of his very general statement as to time is entirely nullified by his testimony on cross-examination, when he is addressing himself to the same subject, "I don't know that I had seen that fence at all previous to January 25, 1912." The only other witness for plaintiff was one Walker, who resided on respondent's property from October, 1911, to the end of 1913. He testifies on this subject, "I particularly noticed the fence when I went there being in a very poor condition at this one particular spot about one thousand feet south of this crossing—one-third of a mile or one-fifth of a mile . . . covered with sand in some places. The fence was in very poor condition all the way from the point south one-fifth of a mile. . . . It was down in some places; the wire was all rusted and broken in places. . . . On the west side I think the fence was covered over with sand in places; not in many places. One particular place was covered for quite awhile. . . . I would see this fence two or three times a week; sometimes I wouldn't see it for probably two months. . . . On an average I would see it . . . once a month, . . . and the condition of the fence was the same each time I saw it up to the time they built the new fence." One of appellant's witnesses testified that no new fence was built before 1913.

Notwithstanding the testimony of both Graham and Walker, it is quite possible that the pile of sand by means of which the two cows crossed over the fence had been deposited by the wind but a few hours before their entry into the right of way. Graham had been on the ranch only ten days and could not say that he had ever seen the place in question until the moment when, after finding the dead cattle, he back-tracked their course to the place of entry over the heaped-up sand. Walker's testimony is quite as far afield. The point at which he says the fence was covered may not have been the

same point at which the cattle crossed it. He says it was one thousand feet, a third of a mile, a fifth of a mile—that is, one thousand feet, 1,760 feet, 1,056 feet—south of the crossing. Moreover, sometimes he did not see even the place he had in mind oftener than once in two months. Therefore, he may not have seen it for a period of two months next preceding January 25th. It is to be noted, also, that the only statement of Walker which could possibly bear upon the present question was this: "The condition of the fence was the same each time I saw it up to the time they built the new fence." It is quite certain, however, that he refers to the condition of repair of the fence itself by this language, and not to its being covered with sand. This seems to be true for two reasons: First, most of his testimony preceding the statement has to do with the bad state of the fence itself, not with the matter of sand; second, he had already said, as to sand, "the fence was covered over with sand in places, not in many places. One particular place was covered for quite a while." If the rules of law in such an action as the present are the same as in the ordinary action for damages caused by negligence in not maintaining right of way fences, then the finding of negligence under the first cause of action is unsupported by the evidence, for the reasons stated. But the respondent contends that they are not the same. In all such cases, a railroad company is bound to use reasonable diligence in keeping its right of way fences in repair, and it need not resort to extraordinary means, such as the maintenance of a special patrol, to insure that its fences will not be broken or that they are promptly repaired, if broken. (*Johnson* v. *Southern Pacific Co.*, 11 Cal. App. 278, [104 Pac. 713]; *Wills* v. *Southern Pacific Co.*, 31 Cal. App. 723, [161 Pac. 501].) The respondent contends that the exercise of reasonable diligence by the appellant for the purpose of properly maintaining its fences through the property of respondent requires a resort to unusual means because of the unusual and shifting character of the country at that place. In other words, respondent contends that what is reasonable diligence in any case of this character depends upon the conditions present in the case. This latter statement is undoubtedly correct. It is readily perceived that conduct which might answer the call for reasonable diligence in one case, could be entirely inadequate in another. The respondent does not say that the ap-

pellant should have maintained a constant patrol, or that it should have built its fences higher, where its road passes through respondent's ranch, but the contention amounts to something like that. We might possibly agree with this position if the evidence showed that the shifting of the sands in a material degree occurred daily, or weekly, or even after intervals of longer duration; but we do not understand the evidence as going to any of those extremes. Taking the entire showing made by the record, there may be periods of long duration, during each year, when the surface of the sands is not disturbed or moved to such a degree as to render the country different, in the respects material to this controversy, from an ordinary tract of land. Under all the evidence, we must hold that the reasonable diligence required of appellant was of a similar character to that required in what we have called the ordinary fence case, and that there is no showing that the appellant did not exercise such diligence. There should have been no recovery on the first cause of action.

The third cause of action was for the value of a cow and her calf. The cow was killed on or about April 2, 1913. The claim of respondent is that the calf was starved because of the loss of the cow, which was suckling it at the time, and that the appellant is therefore liable for its loss, along with that of the mother. The testimony of Graham plainly shows that the cow entered the right of way by means of a sand heap which covered the fence at a point about a thousand feet south of the crossing fence mentioned in his testimony in support of the first cause of action. He also testified, "To my knowledge this fence at this point had been covered with sand more or less all the time from January 25, 1912, up to April 2, 1913. By more or less I mean the sand drifts with the wind. It would be covered up sometimes deeper than it would at others. Portions of it was covered at all times." It is true that on cross-examination he said it might have been nearly as much as thirty days before April 2d that he had last seen the sand at the point in question; but this did not entirely break down the effect of the statement above quoted from his direct examination, which showed a practically constant condition at the very point where the cow entered the right of way. His testimony was much more satisfactory upon the point than was the testimony of Walker in support

of the first cause of action. The evidence was sufficient to justify the finding of the trial court that the cow was killed through the negligence of the appellant.

There is a contention made by appellant as to the loss of the calf. It is asserted that the respondent should have nourished the little animal by artificial means after the death of the mother. On this point Graham testified: "The calf wandered away and starved and disappeared. We couldn't feed wild calves; we don't try to because a calf at that age won't eat. They are wild and afraid of everything. It was too young. It's mother's milk was what it needed." As we have already determined, under the evidence, that the death of the mother resulted from the negligence of the appellant, this testimony of Graham is sufficient to justify the finding, in effect, that the loss of the calf was the proximate result of that negligence.

The fourth cause of action was based upon the loss of a yearling heifer on or about April 28, 1913. The testimony of Graham shows that the animal crossed the fence by means of a sand dune which covered it. Speaking of the point at which the entry into the right of way was effected, Graham says: "The fence at that point a little previous to that time had been repaired slightly with boards and wires, but the wind had drifted the sand over the fence as before in two or three places and it was in such a condition that cattle could pass in and out." A little later, speaking of the point at which the heifer had entered the right of way, he said: "That is where I describe the fence as being covered with sand." Some of his testimony as to the fence-sand question which we have mentioned in our treatment of the third cause of action also bore upon the fourth. The finding of negligence as to the latter cause of action is supported by the evidence.

The appellant insists that the respondent has at all times had in its own hands the power to protect itself from losses such as those upon which the first, third, and fourth causes of action are based. It is asserted that we will take judicial notice of the fact that certain plants, which grow in sand, will prevent sand-drifts as a result of wind action; and, as the appellant has no right to enter upon the lands of the respondent for the purpose of setting out such plants, or for the purpose of preventing in any manner the sand from being cast toward its right of way, we are asked to decide that it

was incumbent upon the respondent itself to set out the plants mentioned, under a doctrine quoted from Salmond on Torts, section 9, pages 31, 33, as follows: "It is commonly the duty of every man to look after himself, and for injuries which he could have avoided by the use of care, he will seek redress from the law in vain. . . . It is expedient that men should be induced to take care of themselves instead of trusting to the vigilance of others, and to secure this end the law deprives them of any remedy for accidents which they might have avoided with due care. From motives of public policy the law refuses to help those who might have helped themselves." The principles stated can have no application here. Section 485 of the Civil Code provides that, "Railroad corporations must make and maintain a good and sufficient fence on both sides of their track and property," and they are made liable in damages, by the same section, for a failure to make or maintain such fences. For us to hold that the appellant is discharged from the operation of this statute under the facts of the present case would be for us to legislate on this subject, for such a determination would amount to a repeal of the statute *pro tanto*. We can relieve the appellant of the hardship of the present situation in no such manner, especially as, to do so, we should be compelled to shift to the respondent the burden which the statute, by its very general terms, imposes upon the appellant. The danger from these fleeting sands exists only because of the presence of the railroad through the respondent's property, and the duty of the appellant to maintain such fences, through that property, as will keep respondent's cattle from entry upon the right of way, is within both the letter and spirit of section 485, notwithstanding the migratory character of the sand.

We come now to a consideration of the second cause of action, which was based upon the loss of four cows. The animals entered upon appellant's right of way through a breach in its fence caused by the throwing down of a gate and of a part of the fence proper. The question presented is whether the gate and fence gave way because of defects in the gate, or in the posts from which it opened; or whether, being in proper condition, it was thrown down by the crowding of a great number of cattle against it. The loss of the four cows occurred at night. During the day preceding, the gate, which was on a rather steep hillside, had been used for

the purpose of ''crossing'' a band of five hundred cattle from one side of the railroad track to the other. Two calves belonging to cows in the herd were left behind, and there were also cattle in pasture on the other side of the railroad tracks after the crossing of the herd. The crossed herd made a great noise bellowing, in the neighborhood of the gate, during the night, and the assumption is that they were restive and were anxious to get across the tracks to the calves or to the cattle on the other side. No one saw the cows get upon the right of way, but it is not disputed that they entered at or near the gateway. The evidence does show, however, that, on the evening before, the crossed cattle were huddled against the gate and the fence adjacent to it. The gate did not open by means of hinges, but it was suspended at the end opposite the latch end, upon cross-pieces which connected two posts standing side by side. It had been closed the night before, upon the conclusion of the work of crossing the cattle.

The witness Graham testified to certain defects in the gate itself. It hung, at the latch end, in such a way that, if a slight pressure were exerted against it, it would sag open to the extent that cattle might pass through at the sagged end.

There is nothing in the evidence to indicate that either of the posts at the opposite end of the gate was defective in any way, or was too small to answer the purpose of its installation. In short, the evidence contains nothing as to the condition of either of these posts at any time before the loss of the cattle. Considering Graham's testimony as to the tendency of the latch end of the gate to sag open under pressure, the situation after the cattle had been killed was most peculiar. The gate was on the ground but the latch was unbroken, although it was ''pulled out'' of the fence proper. Along with the gate, the panel of fence at the end of the gate opposite its latch end was also down, and one of the two posts which supported the gate at that end by means of cross-pieces, was broken down. It seems apparent, from this description of the condition of the fence and gate, that the entry of the cattle into the right of way was caused by the breaking of the post. Whether it was broken through the crowding of the cattle, whether that crowding was caused by a desire to recross the railroad tracks for the purpose of rejoining the calves or cattle on the other side, or whether the post gave way because of the exertion of some force upon it by a power

unknown, makes very little, if any, difference. The entire catastrophe seems to have resulted through the giving way of a part of the fence which was neither defective nor unfitted for any other reason for the task imposed upon it under ordinary conditions. The appellant is not liable for damages arising in such a manner. The finding of negligence under the second cause of action is not supported by the evidence.

The total amount of the judgment was $415. It is affirmed in the amount of $115, that being the portion of the judgment arising from the third and fourth causes of action; and it is reversed as to the remainder, the sum of three hundred dollars, that sum being the amount of the judgment arising from the first and second causes of action. It is also reversed as to the judgment for costs in the sum of $71.80.

Conrey, P. J., and James, J., concurred.